1   MARC J. FAGEL (CA Bar No. 154425)
    JOHN S. YUN (CA Bar No. 112260)
2     Email: yunj@sec.gov
    THOMAS J. EME (Admitted to Ill. Bar)
3     Email: emet@sec.gov
    Attorneys for Plaintiff
4   SECURITIES AND EXCHANGE COMMISSION
    44 Montgomery Street, Suite 2800
5   San Francisco, California  94104
    Telephone:  (415) 705-2500
6   Telecopy:  (415) 705-2501

7

8

9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>vs. )<br><br>JASON GEORGE RIVERA, JR., MARC )<br>CHRISTOPHER HARMON, THE JOSEPH )<br>RENE CORPORATION, and EXECUTIVE )<br>MEMBERS MANAGEMENT GROUP, )<br><br>Defendants. )<br>_____ ) | Case No. CV-11-04741-SI<br><br>PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S NOTICE OF MOTION AND MOTION FOR ENTRY OF DEFAULT JUDGMENTS AGAINST DEFENDANTS JASON GEORGE RIVERA, JR., MARC CHRISTOPHER HARMON, THE JOSEPH RENE CORPORATION AND EXECUTIVE MEMBERS MANAGEMENT GROUP<br><br>Date: May 4, 2012<br>Time: 9:00 a.m.<br>Courtroom: 10<br>Judge: Susan Illston |

1

## NOTICE OF MOTION

2       PLEASE TAKE NOTICE that plaintiff Securities and Exchange Commission ("Commission")

3   will move the Court in the above-entitled action on Friday, May 4, 2012, at 9:00 a.m., in Courtroom 10,

4   Nineteenth Floor, 450 Golden Gate Avenue, San Francisco, California 94102, for the entry of default

5   judgments against defendants Jason George Rivera, Jr. ("Rivera"), Marc Christopher Harmon

6   ("Harmon"), The Joseph Rene Corporation ("JRC") and Executive Members Management Group

7   ("EMMG") (collectively, "Defendants") on the grounds that the well-pleaded allegations in the Complaint

8   establish Defendants' liability for violating Section 17(a) of the Securities Act of 1933 ("Securities Act"),

9   15 U.S.C. § 77q(a), for violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

10  ("Exchange Act"), 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, and for violating Sections 5(a) and (c) of

11  the Securities Act, 15 U.S.C. §§ 77e(a), (c), by engaging in a fraudulent scheme, by making material

12  misstatements and omissions to investors and by selling unregistered securities.  Additionally, the

13  Complaint's allegations establish Rivera's liability for violating Sections 206(1) and 206(2) of the

14  Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), 6(2), by misappropriating

15  JRC's and EMMG's assets, as well as Harmon's liability for violating Section 15(a)(1) of the Exchange

16  Act, 15 U.S.C. § 78o(a)(1), by acting as an unregistered broker or dealer in the sale of securities in

17  interstate commerce.

18      The Complaint's allegations and materials submitted in connection with this motion also establish

19  that the Court should grant the relief sought in the Complaint by (i) issuing permanent injunctions

20  prohibiting Defendants from violating the pertinent provisions of the Securities Act, Exchange Act and

21  Advisers Act; (ii) ordering Defendants to pay disgorgement, jointly and severally, in the amounts of

22  $7,686,283 million plus pre-judgment interest for Rivera, of $4,486,283 million plus pre-judgment

23  interest for JRC, of $3,200,000 plus prejudgment interest for Harmon and of $3,200,000 million plus pre-

24  judgment interest for EMMG; and (iii) imposing civil monetary penalties against Rivera, Harmon, JRC

25  and EMMG for each of their respective securities violations.

26      This Motion will be based upon the attached Memorandum of Points and Authorities, the

27  Supporting Declaration of Thomas J. Eme, the pleadings on file, the [Proposed] Judgments of Default

28  Against Jason George Rivera, Jr., Marc Christopher Harmon, The Joseph Rene Corporation, and

1    Executive Members Management Group, and such other evidence and oral argument that the Court deems

2    appropriate.

3    DATED: March 23, 2012                          Respectfully submitted,

4

5

6                                                   John S. Yun
                                                    Attorneys for Plaintiff
7                                                   SECURITIES AND EXCHANGE COMMISSION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Default Judg. Motion
CV-11-04741-SI

1

## **TABLE OF CONTENTS**

2

3   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5       Rivera Used JRC To Defraud Investor Clients With False Promises of
        Safe Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
6
        Rivera And Harmon Used EMMG To Defraud Investor Clients With
7       Fictional Trading Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8       Defendants Are In Default In This Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10      I.      The Legal Standards For Default Judgments Against Defendants . . . . . . . . . . . . . . 6

11      II.     The Complaint Establishes Defendants' Violations Of The Securities Laws . . . . . . . 6

12              A.      The JRC and EMMG Investments Constituted "Securities" . . . . . . . . . . . . . 6

13              B.      Defendants Made Material Misrepresentations and Omissions
                        to Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
14
                C.      Rivera Engaged In a Fraudulent Scheme And Was A Control Person . . . . . 10
15
                D.      Defendants Illegally Made Unregistered Offers And Sales
16                      of Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17              E.      Rivera Defrauded His Investment Advisory Clients . . . . . . . . . . . . . . . . . . . 13

18              F.      Harmon Illegally Sold Securities As An Unregistered Broker . . . . . . . . . . . 15

19      III.    The Court Should Order Remedial Injunctions And Disgorgement . . . . . . . . . . . . . 16

20              A.      The Court Should Order Permanent Injunctions Against Defendants . . . . . . 16

21              B.      The Court Should Force Defendants To Disgorge
                        Their Ill-Gotten Gains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
22
        IV.     The Court Should Impose Civil Monetary Penalties Against Defendants . . . . . . . . 21
23
    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

24

25

26

27

28

1

# **TABLE OF AUTHORITIES**

2

## CASES

3  *Aaron v. SEC*, 446 U.S. 680, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980) . . . . . . . . . . . . . . . . . . . . . 10

4  *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5  *C.F.T.C. v. British American Commodity Options Corporation*, 788 F.2d 92 (2d Cir. 1986), *cert. denied sub nom. Forma v. C.F.T.C.*, 479 U.S. 853, 107 S. Ct. 186, 93 L. Ed. 2d 120 (1986) . . . . . 18

6
7  *Curran v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 622 F.2d 216 (6ᵗʰ Cir. 1980), *aff'd.*, 456 U.S. 353, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8  *Davis v. Fendler*, 650 F.2d 1154 (9ᵗʰ Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9  *Flaks v. Koegel*, 504 F.2d 702 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10  *Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt., L.L.C.*, 479 F. Supp. 2d 349 (S.D.N.Y. 2007) . . 14

11  *Geddes v. United Financial Group*, 559 F.2d 557 (9ᵗʰ Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155 (2d Cir. 1992) . . . . . . . . 6, 11

13  *Hector v. Wiens*, 533 F.2d 429 (9ᵗʰ Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

14  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9ᵗʰ Cir. 1990), *cert. denied*, 499 U.S. 976, 111 S. Ct. 1621, 113 L. Ed. 2d 719 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15
*Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9ᵗʰ Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16  *In re Washington Public Power Supply System Securities Litigation*, 823 F.2d 1349 (9ᵗʰ Cir. 1987)
17  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18  *Janus Capital Group, Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19
*Knapp v. Whinney*, 90 F.3d 1431 (9ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

20  *Koehler v. Pulvers*, 614 F. Supp. 829 (S.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21  *Massachusetts Fin. Servs. v. Security Investor Protection Corp.*, 411 F. Supp. 411 (D. Mass.), *aff'd*,
22  545 F.2d 754 (1st Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9ᵗʰ Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

24
*Osterneck v. Ernst & Whinney*, 489 U.S. 169, 109 S. Ct. 987, 103 L. Ed. 2d 146 (1989) . . . . . . . . 20

25  *Pope v. United States*, 323 U.S. 1, 65 S. Ct. 16, 89 L. Ed. 3 (1944) . . . . . . . . . . . . . . . . . . . . . . . . 6

26  *SEC v. Benson*, 657 F. Supp. 1122 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

27  *SEC v. Blavin*, 760 F.2d 706 (6ᵗʰ Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28

Plaintiff's Default Judg. Motion
CV-11-04741-SI

-ii-

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998) . . . . . . . . . . 12

*SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90 (2d Cir. 1978) . . . . . . . . . . . . . . . 18

*SEC v. Cross Financial Services, Inc.*, 908 F. Supp. 718 (C.D. Cal. 1995) . . . . . . . . . . . . . . . . . . 20

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir.), *cert. denied sub nom. Fehn v. SEC*, 522 U.S. 813, 118 S. Ct. 59, 139 L. Ed. 2d 22 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998), *cert. denied sub nom. Sands v. SEC*, 525 U.S. 1121, 119 S. Ct. 902, 142 L. Ed. 2d 901 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*SEC v. George*, 426 F.3d 786 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1972), *cert. denied*, 414 U.S. 821, 94 S. Ct. 117, 38 L. Ed. 2d 53 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*SEC v. Hansen*, 1984 WL 2413 (S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*SEC v. Interlink Data Network*, Civil Action No. 93-3073R, 1993 WL 603274 (C.D. Cal. 1993) . . 15

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*SEC v. Koracorp Industries, Inc.*, 575 F.2d 692 (9th Cir.), *cert denied sub nom Helfat v. SEC*, 439 U.S. 953, 99 S.Ct. 348, 53 L.Ed.2d 343 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 16

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . 17, 23

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

*SEC v. Nat'l Executive Planners, Ltd.*, 503 F. Supp. 1066 (M.D.N.C. 1980) . . . . . . . . . . . . . . . . . 15

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. Platform Wireless International Corporation*, 617 F.3d 1072 (9th Cir. 2010) . . . . . 12, 19, 20

*SEC v. R.G. Reynolds*, 952 F.2d 1125 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*SEC v. Trabulse*, 526 F. Supp. 2d 1008 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 2d 1244 (1946) . . . . . . . . . . . . . 7

*SEC v. Washington Investment Network*, 475 F.3d 392 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . 14

*SEC v. Zandford*, 535 U.S. 813, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002) . . . . . . . . . . . . . . . . . . 10

*Simpson v. AOL Time Warner*, 452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds, Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976) . . . . 8

*U.S. v. Elliott*, 62 F.3d 1304 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Carman*, 577 F.2d 556 (9th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATUTES, REGULATIONS AND RULES**

15 U.S.C § 77b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. § 77c(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 77d(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 77e(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15 U.S.C. § 77e(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15 U.S.C. § 77q(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. § 77t(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 77t(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 78(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15 U.S.C § 78c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 U.S.C. § 78o(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15 U.S.C. § 78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. § 78u(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 78u(d)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 78u(d)(3)(B)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15 U.S.C. § 78u(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15 U.S.C. § 80b-2(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 80b-2(a)(18) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. § 80b-6(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 80b-6(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 80b-9(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 2461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 C.F.R. § 201.1003 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 C.F.R. § 230.502(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

17 C.F.R. § 230.504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

17 C.F.R. § 240.10b-5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17 C.F.R. § 240.10b-5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

17 C.F.R. § 240.10b-5(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 55(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. Proc. 8(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**OTHER AUTHORITIES**

Investment Advisers Act Release No. 1092 (Oct. 8, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Senate Report 337, 101st Cong., 2d Sess. 1 (June 26, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

## SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Securities and Exchange Commission ("Commission") moves for the entry of default judgments against defendant Jason George Rivera, Jr. ("Rivera"), Marc Christopher Harmon ("Harmon"), The Joseph Rene Corporation ("JRC") and Executive Members Management Group ("EMMG") (collectively, "Defendants") because the Complaint's well-pleaded allegations establish that Defendants illegally took nearly $8 million from over thirty-five investors through their fraudulent scheme and false representations. Complaint, ¶ 1 (Declaration of Thomas J. Eme ("Eme Declaration")), Exhibit A). According to the Complaint, Rivera used JRC to raise approximately $4.5 million from twenty-two investors by falsely representing that the investor funds would be used to acquire diamonds, gold and real estate and would produce annual returns of up to 35%. In reality, Rivera used much of the investor funds for lavish personal expenses. *Id.*, ¶ 2. With Harmon's assistance, Rivera used EMMG to raise approximately $3.2 million from sixteen more investors by falsely representing that the investor funds would provide low risk profits through trading collateralized mortgage obligations and financial instruments. Instead, Rivera used much of these funds for lavish personal expenses and for commission payments to Harmon. *Id.*, ¶¶ 3-4. Defendants depleted the investor funds in JRC and EMMG without repaying most of the investors' principal, while falsely telling investors that their money was safe and would be repaid soon. *Id.*, ¶¶ 29, 32, 57.

The Complaint's allegations establish that Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") by selling securities based upon material misrepresentations and omissions regarding the nature and safety of the investments and by engaging in a fraudulent scheme. Defendants also violated Sections 5(a) and 5(c) of the Securities Act by offering and selling securities without registering those offers and sales with the Commission. Rivera violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") by breaching his fiduciary duties to JRC and EMMG, while Harmon violated Section 15(a)(1) of the Exchange Act by selling EMMG securities to investors without registering as a broker or dealer. To remedy these violations, the Court should impose permanent injunctions against Defendants' further securities violations and require them to disgorge the funds that

1 they raised from the investors, along with prejudgment interest. The Court should furthermore impose

2 civil monetary penalties against each of the Defendants for each of their securities violations.

3 **FACTUAL BACKGROUND**

4 *Rivera Used JRC To Defraud Investor Clients With False Promises of Safe Investments*

5 According to the Complaint, Rivera resided in Alamo, California from 2007 to 2009. Complaint,

6 ¶ 14. In 2007, Rivera formed JRC as a Nevada corporation with its principal place of business in the San

7 Francisco Bay Area. Rivera was JRC's sole owner and officer, and controlled all of its activities. *Id.*,

8 ¶ 15. During 2007 and early 2008, Rivera and JRC raised about $4.5 million from approximately twenty-

9 two investors in California, two other states and Canada. *Id.*, ¶ 18. Rivera represented to JRC investors

10 that he was a successful financier who would profitably manage and invest their money. *Id.*, ¶ 19. Rivera

11 therefore held himself out to investors as a professional manager of JRC's assets, and decided how JRC's

12 investor funds should be invested. *Id.*, ¶ 58. Rivera therefore acted as an investment adviser and

13 fiduciary to JRC. *Id.*, ¶ 61.

14 Rivera represented to investors that JRC would safely provide high returns by pooling investor

15 money to invest in "hard assets" such a real estate, oil, diamonds and gold. *Id.*, ¶ 20. In a brochure and

16 on JRC's website, Rivera claimed that JRC would provide "maximum results with minimum risk." *Id.*,

17 ¶ 19. The investments in JRC were nominally represented by unsecured, one-year promissory notes that

18 Rivera prepared and signed on behalf of JRC. These notes stated that JRC would repay the investor's

19 principal in one year, along with annual interest that ranged between 12% and 35%. *Id.*, ¶ 21.

20 Rivera represented to investors that JRC's profit would be the sums that JRC earned on its

21 investments, minus the amounts JRC owed on the promissory notes. *Id.*, ¶ 22. JRC maintained a bank

22 account controlled by Rivera. This bank account contained the commingled funds that investors gave

23 to Rivera and JRC to manage. *Id.*, ¶ 23. JRC's promissory notes therefore constituted "securities" whose

24 offer or sale had to be registered with the Commission or exempt from registration. Rivera and JRC

25 failed to register the offer or sale of the JRC securities, which were not exempt from registration. *Id.*, ¶¶

26 62-63.

27 Rivera's and JRC's representations to investors were false. Rather than using investor funds to

28 purchase "hard assets," Rivera used much of the funds for lavish personal expenses. *Id.*, ¶ 24. Rivera

1  secretly used about $360,000 in investor funds for a birthday party for his wife and another $1,500,000

2  for improvements to his 8,000 square foot residence in Alamo, California. *Id.*, ¶¶ 25-26. He used other

3  investor funds for luxury cars, basketball tickets and personal expenses, as well as diverting funds to other

4  entities he controlled to cover their operating expenses. This diversion includes transfers totaling around

5  $360,000 to his company, Rivera Real Estate Investments, LLC. ("Rivera Real Estate"). *Id.*, ¶ 27. Rivera

6  also transferred about $1.6 million to his brokerage account, which was used for speculative trading in

7  a single security and suffered losses of approximately $200,000. *Id.*, ¶ 28.

8        Following trading losses and withdrawals for Rivera's personal use, JRC's brokerage account

9  balance declined to just $300 by June 2008. Rivera was unable to repay the promissory notes to investors

10  or to make payments on the $3 million in mortgages on his Alamo residence. *Id.*, ¶ 29. Rather than

11  disclose his depletion of the investor proceeds, Rivera made false representations to investors during the

12  second half of 2008 that "your money is still making money," that all investor funds were "safe," and that

13  JRC remained "extremely strong" with a net worth of $2.4 billion. As late as March 2009, Rivera

14  continued to represent falsely that the investor money was safe because JRC had invested its assets in

15  gold, certificates of deposit, bank guarantees, letters of credit and real estate. *Id.*, ¶¶ 30-31.

16  ***Rivera And Harmon Used EMMG To Defraud Investor Clients With Fictional Trading Programs***

17        Rivera founded EMMG in 2007 as a Nevada corporation with its principal place of business in

18  the San Francisco Bay Area. Complaint, ¶ 15. Rivera owned EMMG and controlled the company as its

19  sole owner and officer. *Id.* After he depleted the JRC investor proceeds, Rivera used EMMG as his fund

20  raising vehicle and recruited Harmon, who was an unemployed construction worker in the San Francisco

21  Bay Area, to help solicit investors for EMMG. *Id.*, ¶¶ 2, 36.

22        Harmon solicited at least a dozen of EMMG's investors and raised about $2.7 million in investor

23  proceeds for EMMG. Rivera paid Harmon about $180,000 in compensation from the investor proceeds

24  for soliciting investors. *Id.*, ¶ 37. Rivera personally solicited at least one investor for EMMG and took

25  about $500,000 from that investor. *Id.*, ¶ 44. Harmon and Rivera falsely represented that EMMG would

26  pool the investor money and generate extraordinary profits through trading in financial instruments such

27  as collateralized mortgage obligations ("CMOs"). *Id.*, ¶¶ 38-39, 44. From October 2008 until December

28  2010, EMMG obtained a total of about $3.2 million from around sixteen investors in California and four

1  other states. *Id.*, ¶ 33. These investor funds were commingled in an EMMG bank account that Rivera

2  controlled and used for his personal expenses. *Id.*, ¶ 48.

3        Harmon represented to investors that EMMG would use licensed traders and trading platforms

4  to generate profits of 25% to 9000% from CMOs, bank instruments and short term bank loans. He also

5  represented that the investor money would be safe because the money would only serve as collateral –

6  without ever leaving EMMG's bank account or a trust account. *Id.*, ¶ 39. Harmon had no factual basis

7  for making these representations to investors. *Id.*, ¶ 40. Harmon also represented to investors that

8  wealthy individuals had invested millions of dollars with EMMG, that Harmon was managing millions

9  of dollars and that he and Rivera had invested millions of dollars in their own funds in EMMG. Harmon

10  had no factual basis for these representations, and in fact knew that he did not have millions of dollars

11  invested in EMMG because he was relying upon Rivera for his living expenses. *Id.*, ¶ 41.

12        The individuals solicited by Harmon memorialized their EMMG investments in written "joint

13  venture" agreements. Rivera assisted Harmon in developing the joint venture agreements for the EMMG

14  investors. *Id.*, ¶ 45. The EMMG agreements were "securities" whose offer or sale had to be registered

15  with the Commission or exempt from registration. Rivera, Harmon and EMMG offered and sold the

16  EMMG securities without the necessary registration or exemption from registration. *Id.*, ¶¶ 64-65.

17        Harmon signed the agreements on behalf of EMMG, and the agreements described the purported

18  trading program that the investor funds would be used for, the supposed historical returns for the trading

19  program and the purported return that the investor would receive. *Id.*, ¶ 42. Harmon knew, or was

20  reckless in not knowing, that the joint venture agreements were false because the trading programs did

21  not exist and because there was no basis to believe that EMMG would produce the profits promised in

22  the agreements. *Id.*, ¶ 43.

23        Rivera solicited an EMMG investor through representations that the investor's money would be

24  used for a CMO trading program. In reality, Rivera used this investor's money for his personal expenses

25  and to make payments to unhappy JRC investors. *Id.*, ¶ 44. Rivera also provided descriptions of the

26  fictitious trading programs to Harmon so that Harmon could provide those descriptions to investors and

27  participated with Harmon in conference calls with investors. Rivera also falsely represented to an EMMG

28  investor that Rivera was a satisfied EMMG investor. Rivera knew, or was reckless in not knowing, that

the representations being made to EMMG investors were false. *Id.*, ¶ 46. The trading programs did not exist, and only one CMO in the amount of $400,000 was purchased with EMMG investor funds. *Id.*, ¶ 47. Rivera was, in reality, using much of the EMMG investor funds for his lavish personal expenses, such as expensive cars, Las Vegas trips and Nordstrom purchases. *Id.*, ¶¶ 48, 50. Rivera used about $1.1 million of EMMG funds for improvements to his Alamo residence. *Id.*, ¶ 49. Rivera also used around $300,000 in EMMG investor funds to make payments to JRC investors. *Id.*, ¶ 51.

Rivera and Harmon employed a series of false representations to reassure investors that their money was being properly used and safe. In June 2009, Harmon sent an email to investors stating that they are now in a trading program that historically generated compounded returns of 200% weekly, when no such program existed. *Id.*, ¶ 53. In March and April 2009, Harmon provided investors with documents purporting to show that Harmon had access to bonds worth billions of dollars that could back up their investments, even though the documents were unfounded. *Id.*, ¶ 54. Harmon also represented that he had traveled to the United Kingdom to place investor money in a trading program, but in actuality Harmon had never made the trip. *Id.*, ¶ 55. Rivera prepared false account statements and bank records to mislead investors into believing that their money was safe and being used for trading programs. *Id.*, ¶ 56. Rivera also falsely denied knowing about the investments of certain individuals who were seeking their profits and falsely promised to provide refunds to investors, even though the money for such refunds was not available. *Id.*, ¶ 57.

Rivera acted as an investment adviser and fiduciary to EMMG. *Id.*, ¶ 61. Rivera made investment decisions for EMMG with respect to the purchase of a CMO, while also misappropriating funds from the investment pool. *Id.*, ¶ 59. By soliciting investors for EMMG in exchange for compensation from Rivera, Harmon was acting as a broker of securities even though he was not registered with the Commission as a broker and was not associated with a registered broker. *Id.*, ¶¶ 66-67.

***Defendants Are In Default In This Litigation***

The Commission filed this action against Defendants on September 23, 2011. The Commission personally served Harmon on September 25, 2011. Docket No. 6. The Commission personally served JRC's and EMMG's registered agent for service of process on September 26, 2011. Docket Nos. 4, 5. The Commission personally served Rivera on November 17, 2011. Docket Nos. 7. Because Harmon,

1  JRC and EMMG failed to respond to the Complaint within the time allowed, the Clerk of the Court

2  entered their defaults on December 13, 2011. Docket No. 16. Because Rivera failed to respond to the

3  Complaint within the time extended to him, the Clerk of the Court entered Rivera's default on January

4  13, 2012. Docket No. 23.

5  **LEGAL ARGUMENT**

6  **I.     The Legal Standards For Default Judgments Against Defendants**

7       With Defendants in default, the well-pleaded allegations in the Complaint are deemed established.

8  *E.g., TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987); *Geddes v. United*

9  *Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977). This means that "the factual allegations of the

10  complaint, except those relating to the amount of damages, will be taken as true." *Geddes*, 559 F.2d at

11  560 (citing *Pope v. United States*, 323 U.S. 1, 12, 65 S. Ct. 16, 89 L. Ed. 3 (1944); *Flaks v. Koegel*, 504

12  F.2d 702, 707 (2d Cir. 1974)). *See also* Fed. R. Civ. Proc. 8(d) (providing that allegations which are not

13  responded to are deemed admitted, except those relating to damages). As a result, all potential

14  affirmative defenses are precluded upon entry of default. *Greyhound Exhibitgroup, Inc. v. E.L.U.L.*

15  *Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992).

16       Unless the Court desires one, an evidentiary hearing is not required on the Commission's motion

17  for entry default judgments. Fed. R. Civ. P. 55(b)(2) (stating that the Court "may conduct such hearings

18  or order such references as it deems necessary and proper"). Instead, the Court may enter default

19  judgments against Rivera, Harmon, JRC and EMMG based upon the written materials submitted by the

20  Commission in support of this application. *Davis v. Fendler*, 650 F.2d 1154, 1161-62 (9th Cir. 1981).

21  As demonstrated below, the Commission's moving papers support the requested default judgments

22  against Rivera, Harmon, JRC and EMMG.

23  **II.     The Complaint Establishes Defendants' Violations Of The Securities Laws**

24       **A.     The JRC and EMMG Investments Constituted "Securities"**

25       The investments in the JRC and EMMG trading pools constituted "securities" that are subject to

26  the provisions of the Securities Act, Exchange Act and Advisers Act. Section 2(a)(1) of the Securities

27  Act, Section 3(a)(10) of the Exchange Act and Section 202(a)(18) of the Advisers Act all define a

28  "security" to include an "investment contract." 15 U.S.C § 77b; 15 U.S.C § 78c; 15 U.S.C. § 80b-

1    2(a)(18). An investment contract constitutes a "security" if it involves (1) an investment of money, (2)

2    in a common enterprise, (3) with the expectation of profits to be derived from the efforts of others. *SEC*

3    *v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 2d 1244 (1946). In applying the *Howey* test,

4    the Ninth Circuit has stated that Congress "defined 'security' sufficiently broadly to encompass virtually

5    any instrument that might be sold as an investment." *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003).

6          The first element, an "investment of money," is established by the Complaint's allegations

7    because every investor "committed his assets to the enterprise in such a manner as to subject himself to

8    financial loss." *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). According to the Complaint, twenty-

9    two investors paid about $4.5 million to JRC so that their money could be pooled to acquire "hard assets"

10   such as real estate, oil and gold. Complaint, ¶ 18. Similarly, a total of sixteen investors paid $3.2 million

11   to EMMG so that their money could be pooled to trade in financial instruments such as CMOs. *Id.*, ¶ 33.

12   By entrusting their funds to JRC and EMMG, the investors subjected themselves to the risk of loss if the

13   trading pools were unsuccessful.

14         The second element under the *Howey* test of a "common enterprise" is established by the

15   Complaint's allegations, which establish both the horizontal and vertical commonality of Defendants'

16   investment scheme. *See SEC v. R.G. Reynolds*, 952 F.2d 1125, 1134 (9th Cir. 1991). "Horizontal

17   commonality" exists when the fortunes of each investor are linked and investor funds are pooled. *See*

18   *Curran v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 622 F.2d 216, 221-24 (6th Cir. 1980), *aff'd.*, 456

19   U.S. 353, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982). Horizontal commonality existed at JRC and EMMG

20   because the investor funds were pooled and commingled in a common bank or brokerage account for the

21   supposed purpose of conducting trading through JRC and EMMG. Complaint, ¶¶ 20, 23, 38, 44, 48.

22         "Vertical commonality" refers to the relationship between the investor and investment promoter,

23   and exists when the fortunes of the investors are tied to the fortunes of the promoters. *SEC v. Glenn W.*

24   *Turner Enterprises, Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1972), *cert. denied*, 414 U.S. 821, 94 S. Ct. 117,

25   38 L. Ed. 2d 53 (1973). A common enterprise exists under the vertical commonality test where the

26   investors' avoidance of loss depends on the promoter's "sound management and continued solvency."

27   *United States v. Carman*, 577 F.2d 556, 563 (9th Cir.1978). Vertical commonality existed because Rivera

28   represented to JRC investors that he was a successful financier who could invest their money and because

1 | Harmon represented to EMMG investors that licensed traders would generate huge profits by trading

2 | instruments such as CMOs. Complaint, ¶¶ 19, 38-39, 44. The investors' profits therefore depended upon

3 | the skill and success of Rivera and the licensed traders.

4 | The *Howey* test's third element of profits derived "from the efforts of others" is satisfied where

5 | the efforts of the promoters are significant or where managerial efforts will significantly affect the success

6 | or failure of the enterprise. *See SEC v. Glen W. Turner Enterprises, supra,* 474 F.2d at 482. The

7 | Complaint's allegations establish this element because Rivera, Harmon, JRC and EMMG would generate

8 | high rates of profits through their trading programs in hard assets (by JRC) and financial instruments (by

9 | EMMG). Complaint, ¶¶ 30, 38-39, 44. Given the satisfaction of the three elements, the Complaint's

10 | allegations establish that the JRC promissory notes and EMMG joint venture agreements constituted

11 | securities under the federal securities laws. *See SEC v. Rubera, supra,* 350 F.3d at 1090.

12 | **B.    Defendants Made Material Misrepresentations and Omissions to Investors**

13 | Section 17(a)(1) of the Securities Act, as well as Section 10(b) of the Exchange Act and Rule 10b-

14 | 5 thereunder, make it unlawful for any person, "in the offer or sale of any securities" and "in connection

15 | with the purchase or sale of any securities" to make untrue statements of material fact, omit to state

16 | material facts, use any device, scheme or artifice to defraud, or engage in any act, practice or course of

17 | business which operates or would operate as a fraud or deceit upon any person. *See* 15 U.S.C. §§

18 | 77q(a)(1), 78j(b); 17 C.F.R. § 240.10b-5(b). Although Section 17(a)(1) of the Securities Act and Section

19 | 10(b) and Rule 10b-5 of the Exchange Act require that the defendants acted with scienter, the requisite

20 | state of mind may be established by a showing of recklessness. *Hollinger v. Titan Capital Corp.*, 914

21 | F.2d 1564, 1568-69 (9th Cir. 1990), *cert. denied*, 499 U.S. 976, 111 S. Ct. 1621, 113 L. Ed. 2d 719 (1991).

22 | A fact is material if there is a substantial likelihood that it would significantly alter the total mix of

23 | information available to a reasonable investor making an investment decision. *TSC Industries, Inc. v.

24 | Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976). Because a "materiality"

25 | analysis focuses upon the investment decision, there is no need to show that the investor's conduct would

26 | have actually been different. *Id.*

27 | The Complaint's allegations establish Defendants' knowing and material misrepresentations and

28 | omissions. Defendants knowingly or recklessly made the false representation that the investors' money

1  would be used for pooled trading by JRC in hard assets and by EMMG in financial instruments that

2  would generate significant profits. They also knowingly or recklessly made false representations that

3  JRC's and EMMG's trading programs would be safe and that the trading was generating profits while

4  keeping the investors' money secure. Defendants furthermore knowingly or recklessly made false

5  representations that Rivera and the traders were successful in their trading programs and that the trading

6  had a history of significant profits. Complaint, ¶¶ 19-20, 38-39, 44.[1] Defendants' misrepresentations

7  regarding how investor funds would be used, the history of profits from the trading platform, and the

8  safety of the investments are necessarily material. *See SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980)

9  (stating that "materiality of information relating to financial condition, solvency and profitability is not

10 subject to serious challenge"); *Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (stating that

11 material information includes, at a minimum, "accurate information on the use of investor funds, the

12 benefits to be derived by the issuer, and relevant financial statements"). These misrepresentations were

13 in connection with the offer and sale of securities because JRC and EMMG raised a total of nearly $8

14 million from over thirty-five investors through the misrepresentations. Complaint, ¶¶ 1-3.

15      Defendants furthermore knowingly failed to disclose to investors how their money was actually

16 being used. Although investors were told that the money was used for trading in hard assets (through

17 JRC) or financial instruments (through EMMG), Defendants instead used the investor money to finance

18 Rivera's lavish lifestyle, to cover the expenses of other businesses, to pay commissions to Harmon and

19 to pay back unhappy investors. Complaint, ¶¶ 4, 24-28, 37, 48-51. Defendants' undisclosed diversions

20

21

---

[1]

22 Rivera and JRC made the misrepresentations to the JRC investors. Rivera personally told investors that
he was a successful money manager who could provide investors with maximum profits with minimum

23 risk and that their money would be pooled into hard assets. Complaint, ¶¶ 19-20. JRC made the
misrepresentations contained in the promissory notes, which bore JRC's logo and contained the

24 represented profits that investors would receive. *Id.*, ¶ 21. Harmon personally misrepresented to the
EMMG investors how their money would be invested and the profits they would make. *Id.* ¶¶ 38-39.

25 Rivera also personally made misrepresentations to an EMMG investor and joined Harmon on sales calls
with investors. *Id.*, ¶¶ 44-45. EMMG made misrepresentations to investors in the joint venture

26 agreements that Harmon signed and that represented how the investor's money would be used and the

27 profits that would be received. *Id.*, ¶ 42. By virtue of these allegations, Defendants were "makers" of
false statements for purposes of liability under the *Janus Capital Group, Inc. v. First Derivative Traders*,

28 ___ U.S. ___, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011), decision.

1  of funds from JRC and EMMG were material to investors. *See SEC v. Benson*, 657 F. Supp. 1122, 1130-

2  31 (S.D.N.Y. 1997) (finding securities fraud where corporate officer took hidden compensation in the

3  form of kick-backs, false expense reports, ticket refunds and commissions). The Complaint's allegations

4  therefore establish Defendants' violations of Section 17(a)(1) of the Securities Act and of Section 10(b)

5  and Rule 10b-5 of the Exchange Act.[2]

6  **C.**   **Rivera Engaged In a Fraudulent Scheme And Was A Control Person.**

7  Besides making material misrepresentations and omissions, Rivera engaged in a fraudulent

8  scheme that violated Exchange Act Rule 10b-5(a) and (c).  17 C.F.R. § 240.10b-5(a), (c).  While Rule

9  10b-5(b) prohibits misrepresentations and omissions, Rule 10b-5(a) and (c) prohibit conduct that is itself

10  deceptive – such as the misappropriation of stock sale proceeds. *SEC v. Zandford*, 535 U.S. 813, 819-21,

11  122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002) (holding that broker's misappropriation of proceeds from sale

12  of securities in a customer's account was a fraudulent scheme in violation of Section 10(b) and Rule 10b-

13  5). As alleged in Paragraph 48 in the Complaint, Rivera secretly misappropriated EMMG assets for his

14  personal use and therefore engaged in a fraudulent scheme. *Id.*

15  To establish that Rivera violated Rule 10b-5(a) and (c) through a fraudulent scheme, the

16  Commission must allege that Rivera engaged in "conduct that had the principal purpose and effect of

17  creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner*, 452 F.3d

18  1040, 1048 (9th Cir. 2006), *vacated on other grounds, Simpson v. Homestore.com, Inc.*, 519 F.3d 1041

19  (9th Cir. 2008).  The Complaint's allegations establish that Rivera engaged in conduct that was designed

20  to conceal his fraud at EMMG by preparing false account statements and bank records that gave the false

21  appearance that EMMG investor funds were being safely invested in CMOs and other financial

22  instruments.  Rivera gave these false documents to Harmon for delivery to EMMG investors.  Complaint,

23  ¶ 56.  Rivera also falsely denied to EMMG investors that he was aware of the investors' investments and

24

25  [2]

26  For similar reasons, Defendants are liable for violating Sections 17(a)(2) and (3) of the Securities Act,
   which prohibits the same misconduct found in Section 17(a)(1) of the Securities Act and Section 10(b)

27  and Rule 10b-5 of the Exchange Act, except that a showing of scienter is not required. *Aaron v. SEC*,
   446 U.S. 680, 701-02, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980); *In re Washington Public Power Supply*

28  *System Securities Litigation*, 823 F.2d 1349, 1351-52 (9th Cir. 1987).

1  made false promises to other investors that they would be repaid. *Id.*, ¶ 57. Between May 2009 and

2  August 2010, Rivera diverted about $300,000 from EMMG's investors to make payments to JRC

3  investors. *Id.*, ¶ 51. The obvious purpose of this conduct was to lull investors into a false sense of

4  security regarding their investments, rather than risk having more investors attempt to withdraw their

5  funds from JRC or EMMG. Rivera's investor payments and communications were therefore part of a

6  scheme that created the false impression that EMMG was operating successful trading platforms and that

7  the promised high rates of return were genuine. *See Simpson v. AOL Time Warner, supra,* 452 F.3d at

8  1048. Accordingly, Rivera is liable for conducting a scheme in violation of Rule 10b-5(a) and (c).

9  Rivera is also liable for defrauding all EMMG investors as a control person of EMMG. Section

10  20(a) of the Exchange Act provides that any person who "directly or indirectly, controls any person liable

11  under" the Act or rules thereunder "shall also be liable jointly and severally with and to the same extent

12  as" the controlled person. 15 U.S.C. § 78t(a). To prevail under Section 20(a), the Commission must

13  establish a prima facie case against Rivera by proving both "a primary violation" and "that the defendant

14  exercised actual power or control over the primary violator." *Howard v. Everex Systems, Inc.,* 228 F.3d

15  1057, 1065 (9th Cir. 2000). The burden then shifts to Rivera to show that he "acted in good faith and did

16  not directly or indirectly induce the act or acts constituting the violation." *See Howard,* 228 F.3d at

17  1065-66 (treating this statutory language as an affirmative defense).

18  As demonstrated above, the Complaint's allegations establish EMMG's violation of Section 10(b)

19  and Rule 10b-5 of the Exchange Act by selling securities through material misstatements and omissions.

20  The Complaint also alleges that Rivera wholly owned and controlled EMMG as its sole owner and

21  officer. Complaint, ¶ 16. These allegations establish that Rivera was a control person of EMMG, so as

22  to be jointly and severally liable for EMMG's violations. *See No. 84 Employer-Teamster Joint Council*

23  *Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 945-46 (9th Cir. 2003)(finding a basis

24  for holding two corporations liable as control persons of another corporation where they owned the

25  majority of the other corporation's stock and controlled its board of directors).

26  Rivera's default precludes him from asserting the purported affirmative defenses of acting in good

27  faith and not inducing the acts constituting EMMG's violation of Section 10(b) and Rule 10b-5. *See*

28  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., supra* 973 F.2d at 159. In any event, the

1   Complaint's allegations demonstrate Rivera's scienter regarding, and active participation in, EMMG's

2   fraudulent conduct by providing false descriptions of the trading programs, preparing false bank

3   statements and misappropriating EMMG's assets. Complaint, ¶¶ 44-46, 49-52, 56. These allegations

4   prevent Rivera from establishing an affirmative defense to his control person liability for EMMG's

5   fraudulent conduct.

6           **D.**    **Defendants Illegally Made Unregistered Offers And Sales of Securities.**

7        Sections 5(a) and 5(c) of the Securities Act prohibit any person from selling a security through

8   interstate commerce "[u]nless a registration statement is in effect as to [such] security," or from offering

9   to sell or selling a security "unless a registration statement has been filed as to such security." 15 U.S.C.

10  §§ 77e(a), (c). The Commission may establish a *prima facie* Section 5 violation by showing: "first, that

11  no registration statement was in effect as to the securities; second, that the defendant sold or offered to

12  sell these securities; third, that there was a use of interstate transportation, or communication, or of the

13  mails in connection with the sale or offer of sale." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.),

14  *aff'd*, 155 F.3d 129 (2d Cir. 1998).

15       The Complaint's allegations establish that Defendants offered and sold securities through

16  interstate commerce without a registration statement on file or in effect. During 2007 and early 2008,

17  Rivera and JRC solicited about $4.5 million from twenty-two investors in California, two other states and

18  Canada. In soliciting these sales, no effort was made to determine whether the investors were

19  sophisticated. Complaint, ¶ 18. Similarly, from October 2008 through December 2010, Rivera, Harmon

20  and EMMG solicited about $3.2 million from sixteen investors in California and at least four other states.

21  Once again, no effort was made to determine whether these investors were sophisticated. *Id.*, ¶ 33. The

22  sale of JRC and EMMG securities to investors in multiple states involved the instruments of interstate

23  commerce. *Id.*, ¶¶ 11, 18, 33. Additionally, in the case of the offers and sales of the JRC and EMMG

24  securities to investors, there was no registration statement filed with the Commission. *Id.*, ¶¶ 62-64.

25  These allegations establish Defendants' *prima facie* violation of Section 5, and the burden therefore shifts

26  to Defendants to show that the offers and sales were exempt from registration. *See SEC v. Platform*

27  *Wireless International Corporation*, 617 F.3d 1072, 1086 (9th Cir. 2010) (finding that defendants failed

28  to establish exemption from registration). Such exemptions from registration must be strictly construed

1   to ensure full disclosure to investors. *Id.*

2          Defendants cannot meet their burden of establishing an exemption because their default precludes
3   them from challenging the Complaint's allegations that no exemption from registration existed.
4   Complaint, ¶ 65.  In any event, the "intrastate offering exemption" in Section 3(a)(11) of the Securities
5   Act is inapplicable because Defendants raised almost $8 million from investors in multiple states and in
6   Canada.  Complaint, ¶¶ 18, 33, 62; 15 U.S.C. § 77c(a)(11).  The "private placement exemption" in
7   Section 4(2) of the Securities Act does not apply because Defendants did not limit the JRC or EMMG
8   offerings to a private placement amongst sophisticated investors.  Complaint, ¶¶ 18, 33, 62; 15 U.S.C.
9   § 77d(2).  The safe harbor from registration provided by Rules 504 of Regulation D under the Securities
10  Act does not apply because the JRC and EMMG offering amounts each exceeded the $1 million limit.
11  Complaint, ¶ 62; 17 C.F.R. § 230.504.  Additionally, Rivera's and JRC's use of a website to tout JRC
12  precludes treating the JRC offering as a private placement under Rule 502(c) of Regulation D.
13  Complaint, ¶ 19; 17 C.F.R. § 230.502(c).  Accordingly, because Defendants' offers and sales of securities
14  were not registered, or exempt from registration, Defendants violated Sections 5(a) and 5(c) of the
15  Securities Act.

16          **E.     Rivera Defrauded His Investment Advisory Clients.**

17          Sections 206(1) and 206(2) of the Advisers Act prohibit fraud by investment advisers on clients
18  or prospective clients.  15 U.S.C. §§ 80b-6(1), 6(2).  Investment advisers owe a fiduciary duty to their
19  clients under Sections 206(1) and 206(2).  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180,
20  191, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963).

21          The Advisers Act defines an "investment adviser" to include any person who (1) for compensation
22  (2) engages in the business (3) of advising others as to the value of securities or as to the advisability of
23  investing in, purchasing, or selling securities.  15 U.S.C. § 80b-2(a)(11).  With respect to the first
24  criterion, "compensation" includes misappropriating client funds for personal use. *U.S. v. Elliott*, 62 F.3d
25  1304, 1310 (11th Cir. 1996). The Complaint alleges such misappropriation by Rivera. Complaint, ¶¶ 24-
26  28, 48-51.

27          With respect to the second criterion, holding oneself out as providing investment advice or giving
28  such advice on a regular basis constitutes "engag[ing] in the business" of being an investment adviser.

1   *U.S. v. Elliott*, 62 F.3d at 1309-10 (citing *Applicability of the Investment Advisers Act of 1940 to*

2   *Financial Planners, Pension Consultants, and other Persons Who Provide Investment Advice as a*

3   *Component of Other Financial Services*, Investment Advisers Act Release No. 1092 (Oct. 8, 1987)

4   (hereafter "Release 1092")). The advice provided to others need not relate solely to securities investing.

5   *See* Release No. 1092 (providing that the"staff has interpreted the definition of investment adviser to

6   include persons who advise clients concerning the relative advantages and disadvantages of investing in

7   securities in general as compared to other investments"). With respect to the third criterion, "advising"

8   includes exercising control over how client funds are invested. *Abrahamson v. Fleschner*, 568 F.2d 862,

9   871 (2d Cir. 1977). Investment advisers can include those who choose others to directly manage the

10   assets of clients. *See SEC v. Washington Investment Network*, 475 F.3d 392, 400 (D.C. Cir. 2007) (firm

11   deemed an investment adviser in part because it advised clients on "choosing among different investment

12   managers").

13        According to the Complaint's allegations, JRC and EMMG operated as investment pools, and

14   Rivera acted as an investment adviser to JRC and EMMG. Complaint, ¶¶ 58-61. Rivera held himself

15   out to investors as the successful JRC money manager who would pool and reinvest their funds in assets

16   that could potentially include stocks. *Id.*, ¶¶ 19, 20, 58. The money raised from JRC investors was

17   pooled in common bank accounts that Rivera controlled. *Id.*, ¶ 23. Rivera drew $1.6 million from the

18   JRC accounts and chose another individual to actively trade stock with the money. *Id.*, ¶ 28. These

19   allegations demonstrate that Rivera represented himself to investors as being an advisor who would invest

20   their money through JRC.

21        Similarly, EMMG was controlled by Rivera, who, together with Harmon, represented to investors

22   that EMMG would pool their money and trade it in instruments that included CMOs, which are a type

23   of security. *Id.*, ¶¶ 37-39; *Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt., L.L.C.*, 479 F. Supp. 2d 349,

24   361 (S.D.N.Y. 2007). Investor money was pooled in a common bank account controlled by Rivera. *Id.*,

25   ¶ 48. He drew $400,000 from the EMMG account to buy a CMO and another $350,000 to invest in a

26   purported program of "leasing" then "monetizing" CMOs. *Id.*, ¶ 47. In light of these allegations, Rivera

27   acted as an investment adviser by advising JRC and EMMG on investing in, purchasing, and selling

28   securities for compensation (misappropriated funds). *See SEC v. Trabulse*, 526 F. Supp. 2d 1008,

1  1009-12, 1016 (N.D. Cal. 2007) (treating an individual as an investment adviser to several intertwined

2  entities for which he served as general partner, sole partner, or officer).

3       A Section 206 violation arises whenever an investment adviser violates his "affirmative duty of

4  'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation

5  'to employ reasonable care to avoid misleading' his clients." *SEC v. Capital Gains Research Bureau,*

6  *Inc.*, *supra*, 375 U.S. at 194 (footnotes omitted).  Section 206 codifies a fiduciary's common law duties

7  of loyalty and of candor.  *See Id.*  Rivera's misappropriation of JRC and EMMG funds violated the duty

8  of loyalty that is incorporated into Section 206 and that he owed to JRC and EMMG.  *Id.*

9        **F.**    **Harmon Illegally Sold Securities As An Unregistered Broker.**

10       Section 15(a)(1) of the Exchange Act makes it illegal for a broker or dealer to effect any

11  transaction in, or to induce or attempt to induce the purchase or sale of, any security without being

12  registered with the Commission or associated with a registered broker-dealer.  15 U.S.C. § 78o(a)(1).

13  Scienter is not required to prove a violation of Section 15(a)(1).  *SEC v. Interlink Data Network*, Civil

14  Action No. 93-3073R, 1993 WL 603274, at *10 (C.D. Cal. 1993).

15       The Exchange Act defines "broker" to be any person "engaged in the business of effecting

16  transactions in securities for the account of others."  15 U.S.C. § 78(a)(4).  The phrase "engaged in the

17  business" connotes regular participation in securities transactions.  *See SEC v. Nat'l Executive Planners,*

18  *Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).  A person effects transactions in securities if he or she

19  participates at key points in the chain of distribution.  *See Massachusetts Fin. Servs. v. Security Investor*

20  *Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st Cir. 1976).   Actively

21  soliciting large numbers of investors, raising large dollar amounts, and receiving transaction-based

22  compensation are factors which support a finding that a person is a "broker."  *See SEC v. George*, 426

23  F.3d 786, 797 (6th Cir. 2005); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 12-13 (D.D.C. 1998); *SEC*

24  *v. Hansen*, 1984 WL 2413, at *10-11 (S.D.N.Y. 1984).

25       The Complaint's allegations establish that Harmon acted as an unregistered broker in violation

26  of Section 15(a)(1).  First, Harmon has never been registered with the Commission as a broker or

27  associated with a broker as a registered representative.  Complaint, ¶ 67.  Second, Harmon engaged in

28  the business of soliciting investors to purchase securities in exchange for compensation.   More

1    specifically, during a ten-month period, he was paid $180,000 by Rivera in exchange for selling about

2    $2.7 million worth of EMMG investment contracts to roughly 15 investors. *Id.*, ¶¶ 37, 66.  Harmon's

3    compensation, coupled with his duties as EMMG's chief securities salesman, establishes that he was a

4    broker who was required to register under Section 15(a)(1), but failed to do so.  *See SEC v. George*,

5    *supra*, 426 F.3d at 793, 799 (affirming trial court's finding that a Ponzi scheme defendant who "received

6    transaction-related compensation in the form of [misappropriated] investors' money" was a broker).

7    **III.    The Court Should Order Remedial Injunctions And Disgorgement**

8        In light of Defendants' violations of the federal securities laws, the Court should order permanent

9    injunctions against their future violations and should require disgorgement of their ill-gotten gains from

10   the violations.

11       **A.    The Court Should Order Permanent Injunctions Against Defendants.**

12       Sections 21(d) and 21(e) of the Exchange Act, Section 20(b) of the Securities Act and Section

13   209(d) of the Advisers Act provide the Court with authority to grant the Commission's request for a

14   permanent injunction.  15 U.S.C. §§ 77t(b), 78u(d), (e), 80b-9(d).  Under those statutory provisions, this

15   Court should issue a permanent injunction prohibiting further statutory violations based upon a "proper

16   showing" by the Commission.  Such a "proper showing" is made when the Commission establishes that

17   Defendants' conduct constitutes violations of the federal securities laws and that there is a reasonable

18   likelihood that the misconduct will recur unless the Defendants are enjoined. *SEC v. Fehn*, 97 F.3d 1276,

19   1295 (9th Cir.), *cert. denied sub nom. Fehn v. SEC*, 522 U.S. 813, 118 S. Ct. 59, 139 L. Ed. 2d 22 (1997);

20   *SEC v. Murphy*, *supra*, 626 F.2d at 655.

21       Whether a likelihood of future violations exists depends upon the totality of circumstances.  Of

22   primary significance is past illegal conduct from which the Court may infer the likelihood of future

23   violations. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).  Other factors include

24   the degree of scienter involved; the isolated or recurrent nature of the violation; and the likelihood, due

25   to a defendant's business or occupation, that future violations might occur. *SEC v. Fehn*, 97 F.3d at

26   1295-96; *SEC v. Murphy*, 626 F.2d at 655.  Moreover, the fact that the illegal conduct has ceased does

27   not foreclose injunctive relief. *SEC v. Koracorp Industries, Inc.*, 575 F.2d 692, 698 (9th Cir.), *cert denied*

28   *sub nom Helfat v. SEC*, 439 U.S. 953, 99 S.Ct. 348, 53 L.Ed.2d 343 (1978).

As demonstrated above, the Complaint's allegations establish instances of egregious violations. Rivera, Harmon, JRC and EMMG violated the anti-fraud provisions of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act and also violated the registration provisions in Section 5 of the Securities Act. Defendants acted with high degree of scienter because they falsely represented to investors how their funds would be used and the qualifications of JRC's and EMMG's management. Rivera and JRC falsely told investors that their money would be, and was, being used for profitable "hard asset" investments, when much of the money was being misappropriated for Rivera's lavish lifestyle. Complaint, ¶¶ 19-29. Additionally, Rivera, Harmon and EMMG falsely told investors that their money would be, and was, being used for trading programs in CMOs and other financial instruments. In reality, Rivera was secreting diverting the money for his personal expenses, Harmon was receiving commission payments, and $300,000 was used to pay off JRC investors. *Id.*, ¶¶ 33-51. The egregious character of Defendants' misconduct is also demonstrated by their repeated efforts to mislead investors about the status of their investments. Rivera falsely told investors that their money was safe and generating profits and, in the case of EMMG, Rivera created false account and bank statements to conceal the misappropriation of investor money. Rivera also falsely denied knowing that investors had invested in EMMG. *Id.*, ¶¶ 31, 52-57. Rivera's wrongful intent in making these false statements is imputed to JRC and EMMG because he is the sole owner and principal of those entities. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing individual's scienter to entity).

Harmon joined in this deception by falsely telling EMMG investors that the trading programs were starting up and that he had traveled to England to place money in the trading program. Harmon also provided investors with a false document purporting to shown that EMMG had access to a $300 billion bond. *Id.*, ¶¶ 53-55. Additionally, Rivera has demonstrated an on-going intention to deceive investors. After the filing of this lawsuit, an investor contacted Rivera to learn the status of her investment and whether she will be repaid. Rivera sent an email to the investor claiming that he is working on getting her repaid in the near future. Eme Declaration, ¶ 16 and Exhibit L.

Finally, the scope of Defendants' fraud justifies issuing permanent injunctions. The fraudulent sale of JRC and EMMG securities lasted, in combination, from 2007 through 2010 and involved nearly

1   $8 million dollars in investor proceeds. *Id.*, ¶¶ 1-3.  The securities violations giving rise to this case

2   therefore lasted for a substantial period of time and has caused a substantial amount of losses for

3   investors.  Accordingly, there is a significant risk that Defendants will commit additional securities

4   violations without a court order.  The Court should therefore issue the requested injunctions to protect

5   investors from future misconduct by Defendants. *See SEC v. Fehn*, 97 F.3d at 1295-96.

6                  **B.**   **The Court Should Force Defendants To Disgorge Their Ill-Gotten Gains.**

7           Because Defendants' violated the federal securities laws, this Court has the power to order their

8   disgorgement of their ill-gotten gains.  *See, e.g.*, *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985).  The

9   "purpose of disgorgement is to force 'a defendant to give up the amount by which he was unjustly

10  enriched' rather than to compensate the victims of fraud." *Id.* (quoting *SEC v. Commonwealth Chemical*

11  *Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)).  Disgorgement may encompass all benefits derived by

12  a violator where the continued operation of a business arose from fraudulent conduct. *See SEC v. First*

13  *Pacific Bancorp*, 142 F.3d 1186, 1192 (9th Cir. 1998) (ordering disgorgement of salaries, commissions

14  and various fees because the fraud allowed the violators to continue to operate the company and "milk

15  the asset"), *cert. denied sub nom. Sands v. SEC*, 525 U.S. 1121, 119 S. Ct. 902, 142 L. Ed. 2d 901 (1999);

16  *C.F.T.C. v. British American Commodity Options Corporation*, 788 F.2d 92, 93-94 (2d Cir. 1986), *cert.*

17  *denied sub nom. Forma v. C.F.T.C.*, 479 U.S. 853, 107 S. Ct. 186, 93 L. Ed. 2d 120 (1986).

18          To be adopted by the Court, the Commission's disgorgement formula only has to be a reasonable

19  approximation of the gains causally connected to the violation. *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir.

20  1995); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).  Any "'risk of uncertainty [in

21  calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'"

22  *Patel*, 61 F.3d at 140 (quoting *First City Fin. Corp.*, 890 F.2d at 1232). According to the Complaint, from

23  2007 through 2010, Defendants took nearly $8 million from investors through false representations that

24  the money would be used for trading pools for "hard assets" by JRC and financial instruments by EMMG.

25  In fact, virtually none of the money was used for that purpose. Complaint, ¶¶ 1-3.

26          Documents, bank records and sworn testimony collected by the Commission's staff support the

27  disgorgement amounts sought from Rivera, Harmon, JRC and EMMG.  As demonstrated in the Eme

28  Declaration, JRC produced business records showing that JRC issued $3,340,303 in promissory notes

1    and written agreements to investors between March 31, 2007 and April 14, 2008. Eme Declaration Table

2    1, ¶¶ 3-5 and Exhibits B-1 to B-19. Additionally, Rivera has testified that an investor named Marco

3    Simonelli ("Simonelli") invested hundreds of thousands of dollars in JRC, as well as lending $1 million

4    to Rivera personally. Eme Declaration, ¶ 7 and Exhibit C. According to records from Wells Fargo Bank,

5    Simonelli made wire transfers totaling $1,975,980 to accounts for JRC or Rivera Real Estate. Eme

6    Declaration, ¶ 8 and Exhibit D. This evidence supports the conclusion that Simonelli invested $975,980

7    in JRC, while lending the remaining $1 million to Rivera. *Id.* Additionally, the Commission has received

8    documents from Thomas Hall ("Hall") and Ryan Holdford ("Holford") showing that they invested

9    $170,000 in a joint venture agreement with JRC. Eme Declaration, ¶ 9 and Exhibit F. When the

10   investments described in Table 1 are combined with the Simonelli and Hall and Holford investments, a

11   total of at least $4,486,283 in investor proceeds was paid to JRC. Eme Declaration, ¶ 10.

12          The Commission obtained testimony from Rivera and Harmon regarding the identities of some

13   of the investors in EMMG. Eme Declaration, ¶¶ 11-13 and Exhibits C, G, H, I, J. The Commission's

14   staff also reviewed bank account records for EMMG. According to the staff's review of those records,

15   EMMG investors paid a total of $3,235,550 into the EMMG bank account. Eme Declaration, Table 2,

16   ¶¶ 14-15 and Exhibits E, K-1 to K-24. This is slightly more than the $3.2 million amount alleged in the

17   Complaint. *Id.*; Complaint, ¶¶ 3, 33.[3]

18          Defendants used the JRC and EMMG investors as a source of funding when they raised nearly

19   $8 million through the unregistered sale of securities in violation of Section 5 of the Securities Act.

20   Given defendants' violation of Section 5, their ill-gotten gains for disgorgement purposes is the entire

21   amount that each Defendant participated in raising from investors. *See SEC v. Platform Wireless*

22   *International Corporation, supra*, 617 F.3d at 1096-97. Additionally, because Defendants acted together

23   in selling unregistered securities, the court should hold them jointly and severally liable for disgorgement.

24   *Id.* at 1098. This means that Rivera and JRC should jointly and severally disgorge the $4,486,283 that

25   

26   [3]

27   To be conservative, the Commission is seeking in disgorgement the *lower* of the amount shown to have
     been invested and the amount alleged in the Complaint. The Commission therefore limits disgorgement

28   for the JRC offering to the $4,486,283 shown to have been invested in JRC and for the EMMG offering
     to the $3.2 million alleged in the Complaint.

1 | investors provided to JRC. It also means that Rivera, Harmon and EMMG should jointly and severally

2 | disgorge the $3.2 million that investors provided to EMMG.

3 | As indicated by the Complaint's allegations, very little of the investor funds were used for the

4 | intended trading programs. Instead, much of the money was misappropriated by Defendants for other,

5 | undisclosed uses such as Rivera's lavish lifestyle and perpetuating the fraudulent scheme by making

6 | payments to earlier investors. As a result, the entire amount raised from investors was "milked" by

7 | Defendants in a fraudulent scheme, and should be disgorged. *See SEC v. First Pacific Bancorp*, 142 F.3d

8 | at 1192 (describing propriety of disgorging all benefits when the entire operation is fraudulent).

9 | A necessary component of disgorgement is the award of prejudgment interest on the principal

10 | amount of the ill-gotten gains. *SEC v. Cross Financial Services, Inc.*, 908 F. Supp. 718, 734 (C.D. Cal.

11 | 1995) (ruling that "ill-gotten gains include prejudgment interest to ensure that wrongdoer does not profit

12 | from the illegal activity"). Prejudgment interest on the principal amount will deprive Defendants of the

13 | benefit of the time value of the illegal proceeds. *See Knapp v. Whinney*, 90 F.3d 1431, 1441 (9th Cir.

14 | 1996) (describing court's equitable discretion to award prejudgment interest). Furthermore, Defendants;

15 | culpability in operating a fraudulent scheme justifies the award of prejudgment interest. *See Osterneck

16 | v. Ernst & Whinney*, 489 U.S. 169, 176, 109 S. Ct. 987, 103 L. Ed. 2d 146 (1989) (recognizing degree

17 | of wrongdoing as a consideration in awarding prejudgment interest).

18 | In this case, Defendants violated the securities laws to raise money from investors to finance their

19 | activities. The appropriate interest rate for prejudgment interest is therefore the rate that the Commission

20 | and the Internal Revenue Service ("IRS") use to calculate prejudgment interest. *SEC v. Platform Wireless

21 | International Corporation, supra*, 617 F.3d at 1099-1100. Compounding the IRS interest rate up to the

22 | end of March 2012, the Commission has calculated the proper amount of prejudgment interest to be

23 | $644,742 on the $4,486,283 raised from the JRC investors for a total of $5,131,025 in principal and

24 | prejudgment interest. Eme Declaration, ¶ 17 and Exhibit M-1. Similarly, the Commission has calculated

25 | the proper amount of prejudgment interest to be $194,426 on the $3.2 million raised from the EMMG

26 | investors for a total of $3,394,426 in principal and prejudgment interest. *Id.*, ¶ 17 and Exhibit M-2.

27 | This means that the Court should require Rivera and JRC to jointly and severally disgorge

28 | $5,131,025 for their violations in connection with the JRC offering. The Court should also require

Plaintiff's Default Judg. Motion
CV-11-04741-SI

20

Rivera, Harmon and EMMG to jointly and severally disgorge $3,394,426 for their violations in connection with the EMMG offering.

**IV.   The Court Should Impose Civil Monetary Penalties Against Defendants.**

The Court may impose civil penalties under Section 21(d)(3)(A) of the Exchange Act against any person who violates the Exchange Act.  15 U.S.C. § 78u(d)(3)(A).  In particular, a "third tier" civil penalty may imposed for egregious and injurious violations under Section 21(d)(3)(B)(iii):

> (iii)  Third Tier. Notwithstanding clauses (i) and (ii), the amount of penalty for each such violation shall not exceed the greater of (I) $110,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if –
>
> (aa) the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and
>
> (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. §§ 78u(d)(3)(B)(iii).  A similar provision authorizes civil monetary penalties for violations of the Securities Act,  15 U.S.C. § 77t(d)(2), and for violations of the Advisors Act, 15 U.S.C. § 80b-9(e)(2)(C).  In accordance with 28 U.S.C. § 2461, those penalty amounts increased by ten percent to adjust for inflation.  For violations occurring after February 15, 2005, the maximum third tier penalty for an individual was $130,000 and the maximum third tier penalty for "any other person" was $650,000 after adjusting for inflation.  17 C.F.R. § 201.1003 (2005).

Congress adopted those civil penalties provisions as part of the Securities Law Enforcement Remedies Act of 1990 ("Remedies Act").  According to Senate Report 337, the Remedies Act was designed to provide the Commission "with a broader range of remedies to protect investors and maintain the integrity of the nation's securities markets."  Senate Report 337, 101st Cong., 2d Sess. 1 (June 26, 1990).  Congress therefore authorized the civil penalties to provide additional deterrence:

> . . . Since disgorgement merely requires the return of wrongfully obtained profits, it does not impose any meaningful economic cost on the law violator. The Committee, therefore, concluded that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that would otherwise provide great financial returns to the violator.
>
> The proposed civil money penalties also will provide a financial

1

disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws. . . .

2

*Id.* at 10.

3

4

That additional deterrence was necessary in light of the rapidly growing securities markets and the Commission's limited resources. In words that clearly foreshadowed the later Sarbanes-Oxley Act of 2002, Senate Report 337 states:

5

6

7

8

9

> In this environment, the ability to manage a growing enforcement workload and to impose adequate remedies to deter law violations is critical to the success of the SEC's enforcement program and, therefore, is necessary for investor protection. . . . Accordingly, the major provisions of the bill give the SEC greater authority and flexibility in the conduct of its law enforcement efforts and strengthen the remedial effect of the SEC's enforcement program.

10

*Id.* at 2.

11

12

13

14

15

16

17

18

19

20

21

The Court should order the maximum third tier civil penalty of $130,000 against Rivera for each of his violations of Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, Section 5 of the Securities Act and Sections 206(1) and (2) of the Advisers Act. Rivera acted with a high degree of scienter because he never attempted to register the sale of securities, knowingly induced investors into a fraudulent scheme and used representations that he knew involved complete fabrications. He also caused significant injury to investors because JRC and EMMG took nearly $8 million, in total, from investors and then diverted the money so that the investors are unlikely to recover their investments. Furthermore, Rivera has demonstrated a complete disregard of the wrongful nature of his conduct, and is still trying to mislead investors into believing that he will repay them. Significant civil penalties are therefore necessary to send the appropriate deterrent message to Rivera and to other potential securities law violators.

22

23

24

25

26

27

28

The Court should also order the maximum third tier civil penalty of $130,000 against Harmon for each of his violations of Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, Section 5 of the Securities Act and Section 15(a) of the Exchange Act. Harmon never attempted to register the sale of the securities and knowingly deceived the EMMG investors by falsely representing that their money would be placed into highly successful trading programs in CMOs and other financial instruments. In fact, he knew that the trading programs did not exist, and therefore had to

fabricate a story to investors that he had traveled to England to set up a trading program.  Harmon also fabricated stories about his control of a large bond to placate investors.  Despite lacking any registration with the Commission to offer or sell securities, Harmon arranged the sale of EMMG securities – i.e., the purported joint venture agreements – and received $180,000 in fees for selling the securities.  Harmon therefore acted as a broker of securities without registering as a broker or being associated with a registered brokerage firm.  Through his false representations and illegal securities sales, Harmon helped Rivera and EMMG take $3.2 million from investors over a two-year period.  Harmon's fraud therefore caused significant losses for investors, and warrants third tier civil penalties.

For similar reasons, the Court should order the maximum third tier civil penalty of $650,000 against JRC and EMMG for each entity's violations.  Because Rivera is JRC's and EMMG's sole owner and principal, his scienter is imputed to those two entities.  *See SEC v. Manor Nursing Centers, Inc.*, *supra*, 458 F.2d at 1089 n.3.  As a result, his high degree of scienter in deliberately selling unregistered securities, operating a fraudulent scheme, making materially false representations to investors and misappropriating investor proceeds is imputed to JRC and EMMG in determining the appropriateness of civil penalties against those entities.  Additionally, JRC and EMMG have taken millions of dollars from investors without returning the money, so as to cause significant harm to investors.  Civil penalties against both JRC and EMMG are therefore warranted.

## CONCLUSION

For the reasons demonstrated above, the Court should enter the proposed judgments of default against Rivera, Harmon, JRC and EMMG by imposing permanent injunctions, disgorgement and civil monetary penalties.

DATED: March 23, 2012

Respectfully submitted,

John S. Yun
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION